RECEIVED

JUL 1 7 2017

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

RICKY D. HAYES                                   CIVIL ACTION NO. 16-0214

VERSUS                                           JUDGE DOHERTY

DEARBORN NATIONAL LIFE                           MAGISTRATE JUDGE HANNA
INSURANCE CO.


### MEMORANDUM RULING

Now pending before the Court are cross motions for summary judgment, filed by defendant Dearborn National Life Insurance Company ("Dearborn National") [Doc. 21] and by plaintiff Ricky D. Hayes [Doc. 27]. Pursuant to the motions, defendant seeks dismissal of plaintiff's claims with prejudice at plaintiff's cost; plaintiff seeks a reversal of defendant's decision terminating his continued receipt of long-term disability ("LTD") benefits. For the following reasons, defendant's motion is GRANTED, and plaintiff's motion is DENIED.

I.      **Factual Background**

Plaintiff Ricky Hayes worked in the insurance industry for approximately 26 years. [Doc. 21-3, p. 4; Doc. 12-4, p. 60] Plaintiff was employed by F.A. Richards & Associates, Inc. as an Adjuster in Charge from 1999 until he stopped working on October 20, 2010. [Doc. 12-23, p. 80] Mr. Hayes was a participant in a group long-term disability plan, sponsored by F.A. Richards & Associates, Inc., and underwritten and administered by Dearborn National. [Doc. 21-3, p. 1] The LTD plan is governed by ERISA. [Doc. 32, p. 2]

On October 28, 2010, Plaintiff submitted a claim for short-term disability benefits based on an asserted disability date of October 20, 2010, due to diagnoses of depression, anxiety and sleep disorder. [Doc. 21-3, ¶ 14; Doc. 12-5, p. 90] Plaintiff was approved for short-term disability

benefits on November 8, 2010. [Doc. 12-5, p. 93] On June 9, 2011, after expiration of his short-term disability benefits, plaintiff was approved for long-term disability benefits, effective April 18, 2011. [Doc. 21-3, ¶ 17] In the letter approving LTD benefits, plaintiff was advised that because his "primary disabling conditions" at that time were "Major Depressive Disorder, with anxious features and Obsessive Compulsive Disorder," his benefits would be limited to twenty-four months of payments (i.e., until April 18, 2013), pursuant to the "Mental Disorder" limitation set forth in the LTD policy. [Doc. 12-5, pp. 44, 47] In follow-up letters dated February 17, 2012 and October 29, 2012, Dearborn National again noted plaintiff's benefits would be limited to twenty-four months due to the Mental Disorder limitation in the policy. [Doc. 12-3, pp. 68-69; Doc. 12-2, p. 35]

The LTD policy sets forth the terms and provisions of the Plan, including the benefits available and the procedures for submitting claims. Under the LTD policy, disability benefits are not payable during the designated 180 day "Elimination Period." [Doc. 21-3, ¶ 7] Thereafter, LTD benefits will be awarded where for twenty-four months following the Elimination Period, a participant is "continuously unable to perform the Material and Substantial Duties of [his or her] Regular Occupation" due to sickness or injury. [Doc. 12-1, p. 9 (emphasis omitted)] This is referred to as the "Own Occupation" standard of disability. [Doc. 21-3, ¶ 8] After LTD benefits have been paid for twenty-four consecutive months, a participant will continue to receive LTD benefits up to a maximum period of time designated in the policy if he or she is "continuously unable to engage in any Gainful Occupation" due to injury or sickness.[1] [Doc. 12-1, p. 9 (emphasis omitted)] This is referred to as the "Any Occupation" standard of disability. [Doc. 21-3, ¶ 9] However, benefits are capped at twenty-four months of payments if the disability "is due to a Mental Disorder of any

---

[1]With regard to Mr. Hayes, the maximum period of benefits that would have been available absent the Mental Disorder limitation was until he reached age sixty-six and six months (i.e., December 9, 2023). [Doc. 21-3, ¶ 11]

type." [Id. at ¶ 10; Doc. 12-1, p. 14]

From the outset of his approval for LTD benefits, plaintiff maintained he suffered not only from a mental disorder, but was physically disabled as well, and thus the twenty-four month mental disorder limitation should not apply to his claim. [Doc. 21-3, ¶ 25; Doc. 12-2, p. 25] Accordingly (and as part of its customary ongoing review of claims), Dearborn National continued to obtain information from plaintiff and his treating medical personnel to determine whether he was entitled to a longer term of benefits in light of his physical disabilities. [Doc. 21-3, ¶ 18; Doc. 12-3, pp. 69-71; Doc. 12-23, p. 2]

On April 16 and 17, 2013, Dearborn National had a clinical review conducted of Plaintiff's claim. Specifically, Margarey Thompson, R.N. and Dr. Miguel Velasquez[2] reviewed all of the medical records obtained by Dearborn National and submitted by Plaintiff. As a result of their review, Dr. Velasquez and Ms. Thompson determined there were no physical findings to support a diagnosis of Fibromyalgia, and plaintiff did not meet the necessary criteria for the diagnosis of Chronic Fatigue Syndrome. Dr. Velasquez and Ms. Thompson did not believe Plaintiff to be limited in his activities in any respect given his exam findings. [Doc. 21-3, ¶ 35]

As a result of this review, Dearborn National sent Plaintiff a letter on May 17, 2013 advising of its conclusion that "the medical data does not support the restrictions and limitations" provided by plaintiff's primary care physician, and noting there was "no physical exam finding or testing supporting [plaintiff's] lack of functionality to perform [his] occupation of Adjustor." [Doc. 12-21, p. 12] Accordingly, defendant advised plaintiff his benefits were limited to twenty-four months of payments, which occurred on April 18, 2013. [Doc. 12-21, pp. 11-12] However, because

---

[2]Dr. Velasquez is Board Certified in Family Medicine and Neuromusculoskeletal Medicine. [Doc. 12-12, p. 38]

plaintiff had advised Dearborn National that he was receiving Social Security Disability benefits for physical conditions affecting his functional capacity[3], defendant further advised plaintiff his claim would remain open, plaintiff could submit additional information within 30 days regarding his claim, and defendant would continue paying plaintiff monthly benefits "until such time as a final determination is made." [Id.]

On July 30, 2013, Dearborn National sent another letter to plaintiff advising that it had not received any information from him other than the Social Security Disability award letter which did not set forth the basis for its finding of disability, and therefore, it was closing plaintiff's claim and terminating plaintiff's benefits. [Id. at ¶ 37; Doc. 12-21, pp. 1-2] Shortly thereafter, plaintiff submitted the reports of Mr. Buxton (a psychologist), Ms. Moore (plaintiff's counselor), and Dr. Concepcion (plaintiff's psychiatrist). Dearborn National then provided that information to Ms. Thompson and Dr. Velasquez, who conducted another clinical review of the case on August 26, 2013. Upon reviewing the new information, Dr. Velasquez and Ms. Thompson again concluded there were no physical findings in any of plaintiff's examinations to support his physical diagnoses, and additionally found plaintiff's mental health practitioners did not credibly attest to any physical problems. [Doc. 21-3, ¶ 38] Accordingly, on October 31, 2013, Dearborn National sent plaintiff a letter stating in part:

> The updated medical information was provided by mental health providers and it would not be expected for them to treat the physical conditions. The physical findings appear to be based on self report without testing to confirm diagnosis. Based on the evaluation of the medical documentation . . ., there is insufficient clinical data to support the above stated level of physical impairment.

[Doc. 12-20, p. 93] Defendant further advised plaintiff his claim would remain closed. [Id. at 94]

---

[3]Plaintiff was awarded Social Security Disability benefits by way of a letter dated January 28, 2012. [Id. at ¶ 33]

In response to the termination of LTD benefits, counsel for plaintiff sent Dearborn National a letter dated December 13, 2013, detailing various arguments as to why such benefits should not have been terminated. On April 28, 2014, counsel for plaintiff submitted a formal appeal letter, accompanied by additional medical information for the consideration of Dearborn National. On May 9, 2014, Dearborn National advised plaintiff's counsel it wanted plaintiff to undergo a Functional Capacity Evaluation ("FCE") at Dearborn's expense to assess plaintiff's physical condition. Dearborn National subsequently scheduled an FCE for plaintiff on June 3, 2014 and notified plaintiff's counsel of this appointment on May 20, 2014. However, plaintiff's counsel wrote to Dearborn National on May 20, 2014 and June 2, 2014, advising plaintiff would not undergo an FCE.[Doc. 21-3, ¶¶ 40-42]

In light of plaintiff's refusal to undergo an FCE, Dearborn National sent the case to Behavioral Medical Interventions, an independent medical review organization, for it to assign an independent expert to review the case. Thereafter, Dr. Tanya Lumpkins, a board certified rheumatologist and board certified internist, was assigned to the case. As a part of her review, Dr. Lumpkins spoke with Dr. Yerger (plaintiff's orthopedist) on July 3, 2014.  Following this conversation, Dr. Lumpkins sent Dr. Yerger a letter confirming they had agreed plaintiff was not physically disabled. Dr. Yerger signed and returned this letter acknowledging his agreement that plaintiff was not physically disabled. Dr. Lumpkins also spoke with the only other medical doctor to treat plaintiff, Dr. Vanderlick (plaintiff's internist), on July 3, 2014.  Dr. Vanderlick advised Dr. Lumpkins he had not seen plaintiff in two years, and therefore he was not prepared to discuss plaintiff's current physical condition. [Id. at ¶¶ 43-45] On July 9, 2014, Dr. Lumpkins issued her report to Dearborn National, wherein she accepted plaintiff's diagnoses of Fibromyalgia, Chronic Fatigue Syndrome, and right hip pain. [Doc. 12-8, pp. 91-93] In light of the foregoing conditions,

Dr. Lumpkins identified certain restrictions and limitations that should be placed on plaintiff's physical activities.[4] [Id. at 91]

Upon receiving this report of Dr. Lumpkins, Dearborn National referred the claim to Bob Zukowski, a vocational rehabilitation consultant, to prepare an employability analysis. [Doc. 21-3, ¶ 47] Mr. Zukowski issued his final report on August 20, 2014. He ultimately concluded plaintiff could not perform his own occupation because it involved too much driving. [Doc. 12-8, p. 70] However, because plaintiff had already received LTD benefits for twenty-four (24) months, the "Own Occupation" standard of disability no longer applied. With regard to other occupations, Mr. Zukowski identified seven occupations classified at the sedentary level, which rarely required driving, and that plaintiff could perform.[5] [Id. at 50; Doc. 12-8, p. 67]

On September 5, 2014, Dearborn National issued its final decision on appeal, affirming the termination of plaintiff's LTD benefits based upon the reports of Dr. Lumpkins and Bob Zukowski. [Doc. 21-3, ¶ 51; Doc. 12-20, pp. 44-51] Plaintiff filed this lawsuit on September 14, 2015. [Doc. 1-1]

---

[4]Specifically, Dr. Lumpkins found plaintiff should "avoid working at unprotected heights, driving a company vehicle, working with heavy machinery, or safety sensitive materials." [Doc. 12-8, p. 91] She further found plaintiff should be "limited to light-duty levels of physical function in an occupational setting," he should be allowed to sit for six to eight hours per eight hour workday, and stand and walk two to four hours per eight hour workday. She found plaintiff could "lift and carry, push and pull weights of 20 pounds or less occasionally," he should avoid climbing, crawling, kneeling, or stooping," and he should avoid ladders. [Id.] In light of his right hip pain and reported fatigue syndrome, Dr. Lumpkins found plaintiff should not drive a company vehicle. [Id.] Dr. Lumpkins later clarified plaintiff had not been formally restricted from driving by his treating physicians, but in light of his disabilities and medications, he should not drive a company vehicle and should only rarely drive his personal vehicle for work related assignments. [Id. at 70]

[5]Specifically, Mr. Zukowski identified the following occupations plaintiff could perform, all of which exist in the geographical area in which plaintiff resides: (1) Claims Examiner; (2) Manager, Insurance Office; (3) Insurance Underwriter; (4) Risk and Insurance Manager; (5) Manager, Benefits; (6) Manager, Credit and Collection; and (7) Loan Review Analyst. [Doc. 12-8, p. 67]

## II.    Standard of Review

"Standard summary judgment rules control in ERISA cases." *Cooper . Hewlett-Packard Co.*, 592 F.3d 645, 651 (5th Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Burell v. Prudential Ins. Co. of America*, 820 F.3d 132, 136 (5th Cir. 2016)(internal quotation marks omitted). "In reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001).

In this matter, the parties dispute the appropriate standard of review by which this Court should evaluate Dearborn National's decision to deny plaintiff's claim. Dearborn National argues the abuse of discretion standard should apply. Plaintiff appears to argue a hybrid standard of review - somewhere between de novo and abuse of discretion - should apply.[6] However, should the Court find the abuse of discretion standard applies, plaintiff argues reversal is still warranted. [Doc. 27, pp. 11-12]

---

[6]In this regard, plaintiff acknowledges the language of the Plan grants the administrator "the power to interpret the plan," but argues the language does not grant the administrator "the power to interpret the 'terms,' or words, of the Plan." [Doc. 27, p. 11] According to plaintiff, interpreting the terms of the Plan "must then be left to the courts." [Id.] Likewise, while plaintiff acknowledges the Plan "allows the administrator to determine who is '*eligible to participate*' as a beneficiary and 'to determine the *amount of benefits,*'" he contends the Plan "does not expressly grant the administrator power to determine 'eligibility for benefits.'" [Id. (emphasis in original)] According to plaintiff, eligibility for benefits "should be reviewed *de novo*." [Id.]

The text of ERISA "does not directly resolve the question of the appropriate standard of review of an ERISA plan administrator's decision to deny plan benefits." *Ariana M. v. Humana Health Plan of Texas, Inc.*, 854 F.3d 753, 756 (5th Cir.2017)(internal quotation marks omitted). The Supreme Court holds review is de novo, "unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Under the latter scenario, "courts review the plan administrator's decisions for abuse of discretion." *Ariana M.* at 756.

In this matter, the pertinent language of the Plan states as follows:

> The Plan Administrator is responsible for the administration of the Plan. The Plan Administrator has **full discretionary authority** and control over the Plan. This authority provides the Plan Administrator with the power necessary to operate, manage and administer the Plan. This authority includes, but is not limited to, the power to interpret the Plan and determine who is eligible to participate, to determine the amount of benefits that may be paid to a participant or his or her beneficiary, and the status and rights of participants and beneficiaries. The Plan Administrator also has the authority to prescribe the rules and procedures under which the Plan shall operate, to request information, and to employ or appoint persons to aid the Plan Administrator in the administration of the Plan.
>
> . . . .
>
> . . . [T]he Plan Administrator has the **full discretionary and final authority to**:
>
> - **resolve all matters when a review pursuant to the claims procedures has been requested;**
>
> - interpret, establish and enforce rules and procedures for the administration of the Policy and any claim under it; and
>
> - **determine eligibility of Employees and Dependents for benefits** and their entitlement to and the amount of benefits.

[Doc. 12-2, pp. 32 (emphasis added)]

"Discretionary authority cannot be implied; an administrator has no discretion to determine eligibility or interpret the plan unless the plan language expressly confers such authority on the

administrator." *Wildbur v. ARCO Chemical Co.*, 974 F.2d 631, 636 (5th Cir. 1992). Nevertheless, there is no "linguistic template," and courts are to "read a plan as a whole" to determine if it grants the Plan Administrator discretionary authority. *Id.* at 636-37. Courts are to focus on "the breadth of the administrator's power" to determine whether discretionary authority has been granted to the administrator. *Id.* at 637.

While the language of the Plan before this Court does not expressly state the administrator is granted authority to "construe the terms of the plan," it does expressly state the administrator has full discretionary authority to interpret the plan and "determine eligibility of Employers and Dependents for benefits." [Doc. 12-2, p. 32] Where a plan grants the administrator discretionary authority "to determine eligibility for benefits *or* to construe the terms of the plan," courts are to review the administrator's decision under the abuse of discretion standard. *Bruch* at 115 (emphasis added); *see also Wildbur* at 637 (where plan did "not expressly give the administrator authority to construe the plan terms," but did "expressly give the administrator discretionary authority to determine eligibility for benefits," review was for abuse of discretion). Accordingly, the Court will review the administrator's decision to limit plaintiff's LTD benefits to twenty-four months for abuse of discretion.

"An ERISA claimant bears the burden to show that the administrator abused its discretion." *George v. Reliance Standard Life Insurance Co.*, 776 F.3d 349, 352 (5th Cir. 2015). "A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial."[7] *Singletary v. United Parcel Service, Incorporated,*

---

[7]Typically, a two-step process is used when determining whether a plan administrator abused its discretion. *Holland v. International Paper Co. Retirement Plan*, 576 F.3d 240, 246, n. 2 (5th Cir. 2009). First, the court determines whether the administrator's interpretation was legally correct. *Id.*; *Singletary v. United Parcel Service, Inc.*, 828 F.3d 342, 347 (5th Cir. 2016). If the administrator's interpretation was legally correct, no abuse of discretion occurred and the inquiry ends. *Pylant v. Hartford Life and Acc.*

828 F.3d 342, 347 (5th Cir. 2016)(quoting *Holland v. International Paper Co. Retirement Plan*, 576 F.3d 240, 246 (5th Cir. 2009)). Abuse of discretion "is the functional equivalent of arbitrary and capricious review" in the ERISA benefits review context. *Anderson v. Cytec Industries, Inc.*, 619 F.3d 505, 512 (5th Cir. 2010). "A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Holland* at 246 (quoting *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 215 (5th Cir. 1999)).

"In addition to not being arbitrary and capricious, the plan administrator's decision to deny benefits must be supported by substantial evidence." *Anderson* at 512. "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007)). "The law requires only that substantial evidence support a plan fiduciary's decisions, including those to deny or to terminate benefits, *not* that substantial evidence (or, for that matter, even a preponderance) exists to support the employee's claim of disability." *Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 273 (5th Cir. 2004)(emphasis in original). Ultimately, a court's "review of the administrator's decision need not be particularly complex or technical," as the court must only ensure that the decision falls "somewhere on a

---

*Ins. Co.*, 497 F.3d 536, 540 (5th Cir. 2007). If the court concludes the administrator did not give the plan the legally correct interpretation, the court must determine whether the administrator's interpretation constitutes an abuse of discretion. *Id.* Nonetheless, courts "are not confined to this test" and may "skip the first step if [they] can more readily determine that the decision was not an abuse of discretion." *Holland* at 246, n. 2. The parties in this case have not conformed their arguments to the Fifth Circuit's traditional two-step analysis, and instead focus solely upon whether the Plan Administrator abused his discretion. Because the parties have not briefed whether Dearborn National's decision was "legally correct," but rather debate whether the benefits denial ultimately was an "abuse of discretion," the Court need not decide whether Dearborn National's interpretation of the Policy was "legally correct." *George* at 355, n. 8(internal quotation marks omitted). Instead, the Court decides whether Dearborn National's determination was "arbitrary under the terms of the Policy." *Id.*

continuum of reasonableness–even if on the low end." *Id.* (quoting *Corry* at 398).

In deciding whether there was an abuse of discretion, courts are to also consider whether the plan administrator has a conflict of interest. *Truitt v. Unum Life Ins. Co. of America*, 729 F.3d 497, 508 (5th Cir. 2013). A plan administrator has a conflict of interest if it "both evaluates claims for benefits and pays benefits claims." *Id.* (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008)). "Conflicts are but one factor among many that a reviewing judge must take into account and any one factor will act as a tiebreaker when the other factors are closely balanced." *Burell* at 139 (internal alterations and quotation marks omitted). "The conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggests a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Glenn* at 117. "It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . ." *Id.* A court may afford more weight to a conflict of interest when the process employed to render the denied claim indicates "procedural unreasonableness." *Schexnayder v. Hartford Life & Accident Ins. Co.*, 600 F.3d 465, 469 (5th Cir. 2010). Procedural unreasonableness is a subset of the conflict of interest analysis that describes situations where "the method by which the plan administrator made the decision was unreasonable." *Truitt* at 510. "Procedural unreasonableness" is not an "independent basis on which a district court can find abuse of discretion," but rather, "it is a factor that informs whether the reviewing court may give more weight to the plan administrator's conflict of interest. *Id.* (internal quotation marks, alterations omitted).

### III.   Analysis

Dearborn National argues its decision should be upheld as it "is amply supported by evidence in the record." [Doc. 21-2, p. 21] Plaintiff contends Dearborn National's decision should be reversed, arguing "the Administrative Record contains ample evidence that Hayes is indefinitely disabled and that Dearborn's denial was erroneous and an abuse of discretion. . . ." [Doc. 34, p. 2] As discussed below, the Court finds no abuse of discretion in Dearborn National's decision to terminate plaintiff's LTD benefits after twenty-four months, as the Court finds that decision was neither arbitrary nor capricious, and it was supported by substantial evidence.

In support of his position that the administrator's decision should be reversed, plaintiff generally makes the following three arguments: (1) substantial evidence in the record supports plaintiff's physical disabilities; (2) Dearborn National conducted an unreasonable and inadequate investigation of plaintiff's claim; and (3) Dearborn National had a structural conflict of interest, rendering its decision arbitrary and capricious. [Doc. 27, pp. 13-19]

### A.   Substantial evidence supports plaintiff's physical disabilities

According to plaintiff, "the administrative record is replete with medical evidence - on Dearborn's own forms and recognized by Dearborn's own reviewers - gathered from medical doctors in multiple disciplines, including treating physicians in orthopedics, internal medicine, and psychiatry and from social security's independent reviewer - supporting Hayes' severe physical conditions with disabling restrictions and limitations of indeterminate duration." [Doc. 27, p. 13] This argument misinterprets the burden of proof under ERISA. "The law requires only that substantial evidence support a plan fiduciary's decisions, including those to deny or to terminate benefits, *not* that substantial evidence (or, for that matter, even a preponderance) exists to support the employee's claim of disability." *Ellis* at 273 (emphasis in original). There is no law "that

requires a district court to rule in favor of an ERISA plaintiff merely because he has supported his claim with substantial evidence, or even with a preponderance." *Id.* Even where a plaintiff's claim is supported by substantial evidence, the administrator's denial of benefits must prevail if that decision is also supported by substantial evidence and is not arbitrary and capricious. *Id.*; *see also Dramse v. Delta Family-Care Disability & Survivorship Plan*, 269 Fed.Appx. 470, 478-79 (5th Cir.2008).

**B.    Whether the administrator conducted an unreasonable and inadequate review**

Plaintiff argues, "Dearborn essentially stuck its head in the sand to avoid addressing Dr. Vanderlick's pivotal diagnoses of Chronic Fatigue Syndrome and Fibromyalgia that substantiate Hayes' physically disabling conditions, which have been recognized by his other physicians as well." [Doc. 27, p. 14] According to plaintiff, "Dearborn simply ignores Dr. Vanderlick's input altogether since, when Vanderlick was reached by phone Vanderlick chose not to discuss the case for not having the chart in hand." [Id. at 15] Plaintiff faults defendant for relying on the Dr. Yerger's June 9, 2011 Attending Physician Statement rather than his June 22, 2011 Attending Physician Statement. [Id. at 14] Plaintiff then asserts:

> Dearborn's reviewing physician, Lumpkin, picked up on all the foregoing evidence. Yet Dearborn chose to send the matter out for a cherry-picked review by consultants who disregarded all the submissions that supported Hayes' physical disability, and remarkably, just by their read of a record devoid of any countervailing medical opinions, they arrived at their own countervailing opinions.

[Doc. 27, pp. 14-15]

As to plaintiff's argument Dearborn National ignored Dr. Lumpkins' findings by sending "the matter out for a cherry-picked review by consultants who disregarded all the submissions that supported Hayes' physical disability," that argument is factually incorrect. [Id. at 15; *see also* Id. at 16-17] The consultants to which plaintiff refers (Dr. Velasquez and Nurse Thompson) conducted

their first review in April of 2013, and again in August of 2013, after counsel submitted additional support for plaintiff's claim. In April 2014, plaintiff's counsel appealed Dearborn National's decision discontinuing benefits. After plaintiff refused to undergo a functional capacity evaluation at defendant's request and expense, defendant sent plaintiff's file to an independent medical review organization in June of 2014, where the claim was assigned to Dr. Lumpkins for review. [Doc. 12-20, p. 66] Dr. Lumpkins accepted plaintiff suffered from Chronic Fatigue Syndrome and Fibromyalgia. [Doc. 12-20, pp. 49-50; *see also* Doc. 12-8, pp. 91-93] Defendant's final determination was based on the reports of Dr. Lumpkins and Bob Zukowski (a vocational rehabilitation specialist) - not the nurse and physician "consultants" who originally reviewed plaintiff's claim. Dearborn National accepted plaintiff's asserted physical diagnoses in its letter denying coverage. Thus, defendant did factor into its decision plaintiff's physical limitations caused by Chronic Fatigue Syndrome and Fibromyalgia.

Plaintiff's counsel also mischaracterizes defendant's interactions with Dr. Vanderlick, plaintiff's internist. As noted, plaintiff contends defendant "ignore[d] Dr. Vanderlick's input altogether since, when Vanderlick was reached by phone Vanderlick chose not to discuss the case for not having the chart in hand." [Id. at 15] Plaintiff further argues, "the Insurer's investigator's notes of conversations with . . . Vanderlick reveal that the Insurer chose not to investigate." [Doc. 27, p. 18] In support of this statement, plaintiff argues:

> Dr. Lumpkin's notes of her conversation with Dr. Vanderlick particularly is [sic] telling of the Insurer's arbitrary and capricious handling o the claim. Dr. Lumpkin stated in her report to the Insurer, "You [Dr. Vanderlick] also stated that charts regarding Mr. Hayes' case are currently in storage and you have no access to them right now." Did the Insurer then schedule a time to interview Dr. Vanderlick with his notes on his treatment with Hayes to gather vital facts and opinions from his treating physician? No. And the insurer also did not inform Hayes that Dr. Vanderlick was unavailable to the insurer. The administrative record does not have such an event. That alone quashes the Insurer's assertion that a thorough and

comprehensive review was conducted on the claim.

[Id. at 18 (footnotes omitted)]

Plaintiff has eliminated all context of Dr. Lumpkins' summary of her conversation with Dr.

Vanderlick. This portion of Dr. Lumpkins' report reads as follows:

> I was able to speak with Dr. Michael Vanderlick, Internal Medicine on 7/3/14. What
> follows is a summary of the conversation sent to Dr. Vanderlick for review and
> comment:
>
> "You noted that you were a provider for Mr. Hayes, however over two years ago
> you left private practice and are now working as a hospitalist. You noted that you
> have had no contact with Mr. Hays over the last two years. You also stated that
> charts regarding Mr. Hayes' care are currently in storage and you have no access to
> them right now. It would be available if requested; **however you have no updated
> information upon which to make any current recommendations regarding Mr.
> Hayes' medical diagnoses, care delivered or a current level of function**. Since
> you have not seen Mr. Hayes in over two years, I did not share my opinion with you
> regarding functional impairment or restrictions and limitations."

[Doc. 12-8, p. 87 (emphasis added)]

As defendant already had Dr. Vanderlick's medical records concerning plaintiff, as well as

Dr. Vanderlick's attending physician statements, there was nothing further for defendant "to

investigate," as plaintiff contends. Dr. Lumpkins reviewed the records and opinions of Dr.

Vanderlick, but ultimately relied upon other medical evidence in the administrative record with

regard to plaintiff's limitations and impairments. Accordingly, the Court finds this argument lacks

merit. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)("[C]ourts have no

warrant to require administrators automatically to accord special weight to the opinions of a

claimant's physician; nor may courts impose on plan administrators a discrete burden of

explanation when they credit reliable evidence that conflicts with a treating physician's

evaluation").

With regard to Dr. Yerger, plaintiff faults Dr. Lumpkins for not addressing the changes between Dr. Yerger's Attending Physician Statements dated June 9, 2011 and June 22, 2011, arguing this also shows "the Insurer chose not to investigate." [Doc. 27, p. 18] The portion of Dr. Lumpkins' report addressing Dr. Yerger reads as follows:

> I was able to speak with Scott Yerger, MD on 7/3/14. What follows is the conversation summary sent to Dr. Yerger for review and comment:

> "Mr. Hayes had a disability onset date of 10/20/10. He worked as an adjustor in charge at FA Richards and Associates. His reported diagnoses included chronic fatigue syndrome, fibromyalgia, insomnia and arthritis. As you are aware, he was status post right total hip replacement. In your Attending Physician's Statement that was dated 6/9/11, you noted that he had a stable right hip arthroplasty, that he has the capacity to sit for 8 hours, stand for 4 hours and walk for 4 hours, and at that time the estimated return to work date was noted as 5/4/11. You also opined on that Attending Physician's Statement that the patient had reached Maximum Medical Improvement as it was related to the right hip arthroplasty. The progress notes from 5/4/11 and 6/22/11 demonstrated that he had a total hip replacement with a normal gait, no groin pain, and x-rays showed good alignment with no evidence of loosening. In the progress note 5/4/11, you also noted that incidentally he suffered from severe anxiety and depression and was treated with anti-depressants, and that the patient had been on disability because of this diagnosis. On 6/22/11, he returned to talk about disability forms. At that time, his physical examination was unremarkable. In our teleconference on 7/3/14, you noted that the last time you saw him was in 2011, that you have had no subsequent visit in the intervening three years and that you have no updated information upon which to make and [sic] recommendations or determinations regarding his functional status at this time."

[Doc. 12-8, pp. 87-88] Dr. Yerger signed and returned the above-referenced letter. [Doc. 21-3, ¶ 44]

Although not explicitly stated, it appears plaintiff is of the opinion defendant was required to accept the limitations and restrictions Dr. Yerger listed in his June 22, 2011 Attending Physician Statement. In his June 9, 2011 Attending Physician Statement, Dr. Yerger stated plaintiff could sit for eight hours per day, stand for four hours, and walk for four hours. [Doc. 12-5, p. 30] In his Attending Physician Statement executed thirteen days later, Dr. Yerger stated plaintiff could sit for

only two hours per day, stand for one hour and walk for one hour. [Id. at 1] The progress notes

from Dr. Yerger's June 22 evaluation of plaintiff reflect the reason for the visit as plaintiff "wants

to talk about the disability form." [Doc. 12-4, p. 18] The section entitled "Physical Findings" reads:

> Ricky Hayes is here to talk about his disability form. He said he did not make himself clear when he was here last time. He says he is still limited by fatigue as he walks.
>
> On exam, he has no limp and a negative Trendelenburg sign, negative Trendelenburg gait. He has no abductor weakness on exam but his complaints are subjective that he cannot lift greater than 50 lb. He tries to limit what he does with this because he does not feel that his hip has the strength to consistently do this. He says he avoids climbing ladders and going into the attic and he says that he cannot sit for more than an hour without becoming uncomfortable. He also cannot stand for more than one to two hours at a time without resting because of fatigue. He certainly cannot stand and walk for 8 hours at a time.
>
> We will address his disability form and get back with him. He will follow up pm.

[Id.]

Dr. Lumpkins' report shows she reviewed both of the Attending Physician Statements, as

well as Dr. Yerger's progress notes from his evaluation of plaintiff on the foregoing dates. Dr.

Lumpkins discussed the foregoing documents with Dr. Yerger, as well as Dr. Yerger's treatment

of plaintiff. [Doc. 12-8, pp. 87-88] Dearborn National was entitled to rely on Dr. Yerger's original

opinion in making its benefit determination. *See e.g. Gooden v. Provident Life & Accident Ins. Co.*,

250 F.3d 329, 333-34 (5th Cir. 2001)(administrator does not abuse its discretion when relying upon

treating physician's original opinion, where there is no evidence or explanation as to change in

opinion); *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)("[C]ourts have no

warrant to require administrators automatically to accord special weight to the opinions of a

claimant's physician; nor may courts impose on plan administrators a discrete burden of

explanation when they credit reliable evidence that conflicts with a treating physician's

evaluation").

The record reveals that Dearborn National engaged in an extensive review of plaintiff's claim over the course of several years, ultimately concluding based upon evidence in the record that plaintiff's benefits were subject to the Mental Disorder limitation of the policy. If substantial evidence (which is less than a preponderance) supports the administrator's decision, then the Court must defer to Dearborn National unless it abused its discretion. As discussed above, the Court finds Dearborn National did not abuse its discretion and its decision was supported by substantial evidence in the administrative record, including but not limited to the opinions of Dr. Yerger, Dr. Lumpkins and Mr. Zukowski.

### C.    Conflict of Interest

Because the Court finds Dearborn National's factual determination that plaintiff was capable of performing gainful occupations was not an abuse of discretion, the issue before the Court narrows to whether Dearborn National's conflict of interest supports a finding of abuse of discretion. *Truitt* at 514. Dearborn National had a conflict of interest, because it determines both eligibility for benefits and pays benefits claims. *Id.* Plaintiff asserts the administrator's decision was procedurally unreasonable, and the administrator's review was "biased to deny." [Doc. 27, pp. 13, 16] In other words, it appears plaintiff contends Dearborn National's conflict of interest resulted in an abuse of discretion. Plaintiff points to absolutely nothing in the record showing Dearborn National had a history of biased claims administration. And aside from the headings of his arguments, the only specificity provided possibly supporting an argument of "procedural unreasonableness" reads in its entirety as follows:

> Furthermore, the alleged reasonableness of Dearborn's denial is undercut by its refusal to recognize Social Security's disability ruling while Dearborn required Hayes to seek Social Security Disability. The courts have reviewed such

inconsistency with increased scrutiny:

> ... to apply for SSA benefits because this would reduce [insurer's] LINA's payments to [claimant] Mercer had LINA ultimately found him disabled. On the other hand, when considerations of the SSA's disability determination was not in LINA's financial interest, LINA declined to consider it.

*Mercer v. Life Ins. Co. of North America*, 631, referencing *Metro. Life Ins. Co. v. Glenn*, 128 S.Ct. 2343 (2008) and *Schexnayder v. Hartford Life & Acc. Ins. Co.*, 600 F.3d 465 (5th Cir. 2010). The insurer received reimbursement due to the success of the SSDI claim it initiated, but Dearborn ignores the conclusion and import of the decision when it comes to Hayes. That is a conflict and Dearborn should be equitably estopped from taking a position adverse to its position with Social Security.

[Doc. 27, p. 16 (alterations in original)]

Plaintiff is incorrect when he states defendant refused "to recognize Social Security's disability ruling." Defendant did address plaintiff's award of Social Security Disability benefits in its denial of plaintiff's claim. [Doc. 12-20, pp. 48-49, 94; Doc. 12-21, pp. 1, 12; Doc. 21-3, ¶ 32] Further, as defense counsel notes, "the Social Security Administration ('SSA') does not have a limit on the timeframe for a disability due to mental/psychological conditions contrary to the LTD Policy," and plaintiff's Social Security award was based upon a different set of guidelines than those governing the LTD policy. [Doc. 21-2, pp. 27-28; *see also* Doc. 12-20, p. 94]

Based upon this Court's case-specific review of the administrative record, the Court finds the circumstances in this matter do not suggest a higher likelihood that Dearborn National's conflict affected the benefits decision. As discussed in detail above, Dearborn National conducted a years-long investigation into plaintiff's disability. During its investigation, Dearborn National consulted with, or reviewed reports by, more than ten medical and vocational experts. Dearborn National gave plaintiff multiple opportunities to introduce evidence in support of his disability, and to rebut its evidence showing plaintiff was not disabled. Accordingly, the Court finds Dearborn National's

conflict of interest was clearly outweighed by the substantial evidence supporting Dearborn National's decision and its careful consideration of plaintiff's claim. In light of the foregoing, the Court finds Dearborn National did not abuse its discretion. *See Truitt* at 515.

## IV.    Conclusion

As set forth above, the Court finds Dearborn National did not abuse its discretion, and its decision was supported by substantial evidence. Therefore, because Dearborn National has paid plaintiff the maximum amount of benefits to which he is entitled under the policy, the Court finds summary judgment is warranted in Dearborn National's favor, and plaintiff's complaint is dismissed with prejudice.

THUS DONE AND SIGNED in Chambers, Lafayette, Louisiana, this _17_ day of July, 2017.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE